## CAMPBELL v. MAYOR, ETC., OF CITY OF NEW YORK.

(Circuit Court, S. D. New York. May 14, 1897.)

1. PATENTS—STATUTES OF LIMITATION.
   A patent was granted May 24, 1864, and infringement was begun in 1865, and continued until the expiration of the patent. Suit was begun November 24, 1877. At the time the patent was granted, therefore, there was no federal statute of limitations applicable to infringements, and the state statute would govern. The state statute was displaced by section 55 of the patent act of 1870, which required suits to be brought during the term of the patent or within six years after its expiration. This provision was repealed by Rev. St. § 5599, but existing causes of action were saved. *Held,* that no part of the claim for infringement was barred.

2. SAME—MARKING ARTICLES PATENTED.
   Rev. St. § 4900, in relation to marking articles "patented," does not apply so as to prevent recovery of damages for infringement, when neither the plaintiff, nor any one for or under him, has made or sold the patented device.

3. SAME—NOTICE OF INFRINGEMENT—ESTOPPEL AS TO PRIOR INFRINGEMENT.
   Where notice of infringement is given on a certain date, there is no estoppel, as against complainant, as to prior infringements, when it appears that defendant did not act upon the notice with respect to prior, or even subsequent, infringements, so as to make the claim for the prior infringements inequitable.

4. SAME—COMPETENCY OF WITNESSES.

In determining the profits or savings made by a city by the use of an infringing improvement upon its fire engines, the chiefs of its fire departments, its foremen, and others in those departments engaged at the time and before the infringement commenced, are competent witnesses on the question of the savings accruing from the infringing device.

5. COMPUTATION OF DAMAGES BY THE COURT.

The very long pendency of a suit in equity is good reason for a computation of damages or profits by the court, if it can be done, instead of again referring the cause to a master.

6. PATENTS—INFRINGEMENT—PROFITS OR SAVINGS.

Where, by the use of an infringing device in connection with a city's fire engines, the number of men required with each engine was reduced, the amount of their wages should be included in the computation of savings or profits, although the city did not in fact reduce the number of men employed, but either utilized them for other purposes or allowed them to remain idle.

7. SAME—BURDEN OF PROOF.

Where the complainant has shown that a certain amount of saving to the defendant resulted from the use of an infringing device, the defendant, if he claims that a part of the saving was due to a different device, has the burden of proof in respect thereto and as to the amount attributable to such other device.

Harvey D. Hadlock, Walter K. Griffin, William T. Washburn, and John McDonald, for plaintiff.

Edmund Wetmore and John R. Bennett, for defendant.

WHEELER, District Judge. This suit was begun November 24, 1877, upon letters patent No. 42,920, dated May 24, 1864, and granted to James Knibbs, assignor, for a relief valve in steam fire-engine pumps. The patent was sustained, and the cause sent to an account of profits. Campbell v. Mayor, etc., 20 Blatchf. 67, 9 Fed. 500, and 47 Fed. 515. The master has reported profits from savings in making repairs, $28,336, with a comprehensive statement of evidence and findings as to this claim and others not allowed. The cause has now been heard upon exceptions by each party to this report, some of which raise questions as to any recovery, and some as to any further recovery.

One general question arises upon the statutes of limitation of the state and of the United States. The infringement was begun in 1865, and continued till the expiration of the patent. When the patent was granted there was no federal statute of limitations applicable to infringements, and the state statute would govern. Campbell v. City of Haverhill, 155 U. S. 610, 15 Sup. Ct. 217. The state statute was displaced by section 55 of the patent act of 1870, which provided that "all actions shall be brought during the term for which the letters patent shall be granted, or extended, or within six years after the expiration thereof." This provision was repealed by the Revised Statutes, but existing causes of action were saved by section 5599, with the same right of suit as if the repeal had not been made. The state statute had not run upon any part of this infringement at the time of the act of 1870; the federal statutes took place and saved all of that was prior to December 1, 1873, until six years after the expiration of the patent; and the state statute, which again took

place, had not run upon what was after December 1, 1873, when this suit was commenced. So no part of the recovery sought here was barred, even at law, by any statute. Walk. Pat. § 472.

Another general question arises upon section 4900, Rev. St., which requires all patentees, their assigns and legal representatives, and all persons making or vending any patented article for or under them, to mark or label the articles "Patented," and prohibits the recovery of damages for infringement "by the party failing so to mark," except on proof of notice to the defendant. Mr. Justice Gray, in Dunlap v. Schofield, 152 U. S. 244, 14 Sup. Ct. 576, said:

"The clear meaning of this section is that the patentee or his assignee, if he makes or sells the article patented, cannot recover damages against infringers unless he has given notice of his right."

. Neither the plaintiff, nor any one for or under him, has made or sold this patented device; and he does not come, according to this construction, within this prohibition. The defendant had notice, July 11, 1877, which was alleged in the bill, and has been suggested to have worked an estoppel as to prior infringements. But the defendant did not. act upon the notice with respect to prior, or even subsequent, infringements, so as to make the claim for the prior infringements inequitable because of that precaution as to further infringement, and the insertion of it in the bill would not be any express or implied waiver of other grounds of recovery.

The master reports:

"The Amoskeag Manufacturing Company, one of the largest manufacturers of steam fire engines, immediately appropriated the invention, and an engine equipped with it was delivered by that company to this city. All engines subsequently purchased contained the invention. Engineers in the department witnessed its operation, and one of them applied the device to an old engine then in use. The other engines were thereafter sent to the repair shop to be fitted out with the relieving mechanism. It was extremely valuable in and of itself, and it opened the way for other improvements, which enabled steam fire engines to be operated so as to extinguish fires with a minimum loss in the destruction of property, and to avoid needless waste of water. The superiority of an engine containing in its main water pump this relieving device over those known to the art at the date of the invention is conceded. * * * The first steam fire engine came permanently into service in this city in 1858. There was but one such engine in service in 1860, when Chief Decker took charge of the department. He left the service in 1865, at which time there were twenty-nine in active service and four under construction. The patent in suit was granted May 24, 1864, and the first engine fitted with the relieving mechanism came into the service of the city during the year 1865. At the end of 1866 all the old engines in active service had been fitted with the patented relief."

That the plaintiff's—

"Claims are based upon benefits due wholly or in part to the patented device, which are as follows: (1) Economy in the use of water; (2) reduction in property destruction; (3) economy in engine and pump repairs; (4) prolongation in the life of engines; (5) stability, reliability, and increased efficiency in the use of engines; (6) economy in manual labor; (7) prolongation of the life and savings in the use of hose. As compared with the old style or solid pump engines, the evidence is conclusive that the defendant enjoyed each of the advantages above enumerated by the use in its fire service of steam fire engines subsequent to the grant of the patent in suit. Some of them were due solely to the relieving mechanism, and others were obtained by the use of that device in connection with subsequently patented controlling nozzles. There

was a great saving in water, and the damage to property by water was materially reduced."

The first two of these claims were abandoned for reasons given by the master.

The plaintiff improved as witnesses before the master chiefs of fire departments of the defendant, and foreman and others in those departments, some of whom had been engaged there from long before this infringement was commenced, and all were men of long experience about things connected with it, and of great skill and judgment concerning them. From their testimony as to the utility of the patented device, the uses made of it, and results produced, with their estimates as to the saving in number of men employed in making repairs, the master has found the defendant enabled "to discontinue the services of two machinists in making repairs to engines and pumps, whereby it made a saving of three dollars per day for each of said men, amounting to the sum of $1,848 per year, for the period of fifteen years and four months, making an aggregate saving due to the invention of $28,336," as before mentioned. Nevertheless, apparently because such evidence as to other claims was thought to be less competent, no other savings or profits are found. The exceptions raise questions as to this competency. The testimony is not that of mere experts giving opinions upon supposed cases, but of observers as well, stating facts from their own knowledge, with estimates and opinions thereupon. The cases most relied upon to show the incompetency of such evidence seem to be quite different from this one in this respect. Thus, in Mayor, etc., v. Ransom, 23 How. 487, the plaintiffs furnished no evidence as to damages or profits except that the invention was valuable, and could be applied at an expense of $25, thereby greatly increasing the power of the machine. In Ingersoll v. Musgrove, 14 Blatchf. 541, Fed. Cas. No. 7,040, which was on a patent for an improvement in cuspidors, the plaintiff showed merely that the defendant infringed, and his prices were reduced 30 per cent. In Sargent v. Manufacturing Co., 17 Blatchf. 249, Fed. Cas. No. 12,367, which was on a patent for an improvement on a lock, two witnesses appear to have estimated the value of the device to the defendant without stating facts as a foundation for the estimate. In Munson v. City of New York, 21 Blatchf. 342, 16 Fed. 560, which was a patent on a method for preserving bonds, one witness testified, without stating facts for foundation, as to what, in his judgment, would be the advantage or benefit from the use of that plan. In Garretson v. Clark, 111 U. S. 120, 4 Sup. Ct. 291, which was on a patent for an improvement on a mop head, the plaintiff merely proved the cost of his mop heads and the price at which they were sold. In Coupe v. Royer, 155 U. S. 565, 15 Sup. Ct. 199, which was on a patent for an improvement on a machine for treating hides, one of the plaintiffs testified that, in his opinion, there would be a saving of four or five dollars a hide by using his machine over what it would cost to treat hides by any other method, and that the difference between the treating hides on his machine and by hand would be more than one dollar a hide. Such evidence alone was held in these cases, respectively, to be in-

competent. On the other hand, that the estimates and opinions of experts, and of observers stating facts for foundation, are in many such cases admissible in evidence and competent from which to find ultimate facts relating to such subjects, is well shown in many books and cases.

In 1 Greenl. Ev. (Redfield's Ed.) § 440a, it is said:

"Facts which are latent in themselves, and only discoverable by way of appearances more or less symptomatic of the existence of the main fact, may, from their very nature, be shown by the opinion of witnesses as to the existence of such appearances or symptoms; such as the state of health or of the affections, as already stated. Sanity is a question of the same character. So, too, upon inquiries as to the state or amount of one's property, when the facts are too numerous and evanescent to be given in detail, those acquainted with the facts are allowed to express an opinion, which is the mere grouping of the facts. So, too, as to the marketable condition and value of property, and many other questions, where it is not practicable to give more definite knowledge, opinions are received."

In 2 Best, Ev. (Wood's Ed.) § 517, subd. 2, in speaking of exceptions to the general rule that witnesses are to be confined to knowledge, it is said:

"Another class of exceptions is to be found where the judgment or opinion of a witness on some question material to be considered by the tribunal is formed on complex facts, which, from their nature, it would be impossible to bring before it."

In Wood's note to the same section it is stated that opinions are to be confined to that class of evidence that lies within the peculiar knowledge of a certain class of men—

"Or that class of evidence that from necessity can be given in an intelligible manner in no other way than by the opinions and impressions of the witness, derived through some one of the senses." "As an illustration of the applicability of this class of evidence, it may be stated, generally, that knowledge of any kind gained for and in the prosecution of a business or occupation, as pertaining thereto, which is not generally known, but which only comes from a particular training or experience, is, when material in a cause, sufficient to make its possessor an expert, and to entitle his opinion to be considered and weighed by the jury for what it is worth."

Many cases illustrating the competency of this kind of evidence are mentioned in this note.

In Webber v. Eastern R. Co., 2 Metc. (Mass.) 147, a witness, who did not profess to be an expert, but who had been a county commissioner several years, and had estimated damages for roads and railroads, and as secretary of an insurance company had examined and estimated the value of estates, testified that, in his opinion, the passage of locomotive engines within 100 feet of a building would increase the rate of insurance from $1\frac{1}{2}$ to 2 per cent., and the rent of the buildings would be reduced from one-fourth to one-third; and, on exceptions to this, Shaw, C. J., in delivering the opinion of the court, said:

"He was, we think, quite competent to give his opinion as evidence to the jury upon that subject."

In Porter v. Manufacturing Co., 17 Conn. 249, one question was whether a dam on a stream was reasonably sufficient and safe. Witnesses were admitted to testify that they had been acquainted with the stream many years; that it rose very rapidly in time of freshets;

that the dam was high, and kept back a large pond; and that, in their opinion, under such circumstances, such a dam as the defendant's was could not stand.    As to this Storrs, J., for the court, said:

"The judgment or opinion of these witnesses, as practical and observing men, was sought on this point on the facts within their knowledge and to which they testified. They had acquired by their personal observation a knowledge of the character of the stream, and also of the dam, and were therefore peculiarly qualified to determine whether the latter was sufficiently strong to withstand the former. The opinions of such persons on a question of this description, although possessing no peculiar skill on the subject, would ordinarily be more satisfactory to the minds of the triors than those of scientific men who were personally unacquainted with the facts in the case; and to preclude them from giving their opinion on the subject in connection with the facts testified to by them would be to close an ordinary and important avenue of truth."

And after alluding to the admissibility of the testimony of experts, he said further:

"On such a question the judgment of ordinary persons, having an opportunity of personal observation, and testifying to the facts derived from that observation, was equally admissible, whatever comparative weight their opinions might be entitled to, of which it would be for the jury to judge. It was a question of common sense as well as of science."

In Transportation Line v. Hope, 95 U. S. 297, on a question of negligence in towing a canal boat, a witness had testified that for many years he had been the captain of a tug boat, and was familiar with the making up of tows; that he was a pilot, and had towed vessels on Long Island Sound, although he was not familiar with the Sound, but that he was familiar with the waters of the Chesapeake Bay.    As to the admissibility and competency of his testimony, Mr. Justice Hunt, for the court, said:

"The witness was an expert, and was called and testified as such. His knowledge and experience fairly entitled him to that position. It is permitted to ask questions of a witness of this class which cannot be put to ordinary witnesses. It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. As an expert, he could properly aid the jury by such evidence, although it would not be competent to be given by an ordinary witness. It is upon subjects on which the jury are not as well able to judge for themselves as is the witness that an expert, as such, is expected to testify. Evidence of this character is often given upon subjects requiring medical knowledge and science, but it is by no means limited to that class of cases."

In Walsh v. Insurance Co., 32 N. Y. 427, it was decided that the testimony of experienced navigators on questions involving nautical skill was admissible.    The witness in that case was asked to what cause the loss of the vessel was attributable, which was the point to be decided by the jury.    The court sustained the admission of the evidence, using this language:

"We entertain no doubt that those who are accustomed to the responsibility of commanding, and whose lives are spent on the ocean, are qualified, as experts, to prove the practical effect of cross seas and heavy swells, shifting winds and sudden squalls. The books give a great variety of cases in which evidence of this character is admissible, and we have no doubt of the competency of the evidence to which this objection is made."

In Suffolk Co. v. Hayden, 3 Wall. 315, Mr. Justice Nelson, delivering the opinion of the court on the question of damages in patent cases, said:

"The question of damages, under the rule given in the statute, is always attended with difficulty and embarrassment, both to the court and jury. There being no established patent or license fee in the case, in order to get at a fair measure of damages, or even an approximation to it, general evidence must generally be resorted to; and what evidence could be more approximate than that of the utility and advantage of the invention over the old modes and devices that had been used for working out similar results? With a knowledge of these benefits to the persons who have used the invention, and the extent of the use by the infringers, a jury will be in possession of material and controlling facts therein, in the exercise of a sound judgment, to ascertain the damages, or, in other words, the loss to the patentee or owner by the piracy instead of the purchase of the use of the invention."

In Herring v. Gage, 15 Blatchf. 124, Fed. Cas. No. 6,422, the master's record shows that much testimony of opinions by experts, and by observers stating facts for reasons, was received by the master. As to this Wallace, J., said:

"By further exceptions, the defendants insist that the master's findings, as to the actual savings realized by the defendants by the use of the device, is not sustained by the evidence. This finding is based, in part, upon the testimony of various experts, who were familiar with the practical working of the device in other mills, and who were permitted to state the quantity of flour lost when the device was not used; thus estimating the saving realized under their observations, and basing upon that their opinion of the saving ordinarily gained by the use of the device. The conditions under which the device was used differed in the different instances observed by the witnesses. It is contended that this testimony is not entitled to consideration. To this I cannot agree. Of course, the ultimate inquiry was only as to the saving made by the defendants. It was impracticable to ascertain this by direct evidence, because the defendants did not keep any account relative thereto. They and their witnesses gave their opinions, with the data upon which they were based. The complainants gave the best evidence which was attainable, from the nature of the case."

To the same effect are Railway Co. v. Edwards, 24 C. C. A. 300, 78 Fed. 745, and Equipment Co. v. Blair (2d Circuit, April 8, 1897) 25 C. C. A. 216, 79 Fed. 896.

Upon these authorities and cases, the testimony of the fire chiefs, engineers, and foremen seems to have been amply competent for consideration in ascertaining what was proved upon the issues before the master in this case. He seems to have warrantably found from it the saving in men for repairs, but to have hesitated because of the supposed incompetency of it as to the other claims. But, with its competency so established as to make it proper to be considered, he would apparently have proceeded to ascertain further the validity and amount of other claims made by the plaintiff. As to the saving of men from engine companies, the master in his opinion states:

"The proposition that a number of men could have been dismissed from each company operating with an old-style engine without impairing effective fire service, the improved apparatus compensating for the difference in men, is not seriously contested by the defendant. At any rate, the proofs sustain the proposition. * * * The majority of the witnesses agree that a company of nine men using the approved apparatus was about equal to twelve men using the old-style engine, and they also agree as to the men who could be displaced, viz. one to carry messages from pipe to engine and two men in holding the pipe."

And from this evidence, if he had supposed it to be admissible and competent, he seems to have been persuaded and ready to find

that there would be a saving of three men to each such engine company maintained by the defendant, the city of New York, during all of the time of the infringement of this patent. And as to the saving in hose, he states the testimony of several of these witnesses, and as to that claim says:

"But one factor is wanting,—the percentage of saving. During the period of the accounting the defendant expended for hose the sum of $366,788.64. The lowest estimate of saving was one-third, or 33⅓%. This was · by Mr. Bates. If that were the measuring factor, then, without the relieving mechanism, the city would have been compelled to purchase hose to the amount of $550,182.96, and the difference between the two amounts, $183,394.32, would be the saving. The city would have employed the same number of engines. It would have maintained practically the same equipment. It would have had the same service at fires, and it would have provided hose equal to the necessities of the department. Basing one of the factors upon opinion evidence in such a computation does not call for an irrational presumption necessary to support the contention as to the increased number of engines."

Both parties agree in requesting that this case be not returned to a master, and its long pendency seems to be a good reason for the computation of savings and profits by the court, if it can be done. Tuttle v. Claflin, 22 C. C. A. 138, 76 Fed. 227. The testimony of the witnesses before mentioned is so full upon these two points, and so undisputed upon either of them, that such course in this case seems proper, under the circumstances. For example, the testimony of Martin Cook, foreman of engine company No. 4, No. 39 Liberty street, who had been connected with the department going on 23 years in the capacity of fireman, assistant engineer, engineer, assistant foreman, and foreman, covering all the period of this infringement, as to the saving in men and the saving in hose, who testified:

"373. Re-D. Q. Have you ever known hose, known as the 'Maltese Cross Hose,' to be attached to an engine operated with the relieving mechanism being in use,—or, in other words, with the automatic relief lock,—while the hose was lying in the street? If so, please state the effect of so operating the engine upon that hose. 374. Re-D. Q. Did you prior to 1881? A. Lots of times. It would have an effect on some engines different from others. With a single-pump engine, it would make that jump like a snake through the street,—stretch out from the motion of the pump. A double-pump engine, worked under a high pressure, would do the same, only not to as large an extent. 375. Re-D. Q. What effect would that have on the hose? A. Bad effect; sometimes burst three or four lengths, one after the other. 376. Re-D. Q. In what way as to chafing? A. Wear it out working on the street." "55. Q. What number of men did you require to handle the pipe when the relieving mechanism was in use? A. One; never more than two. 56. Q. Why did it require more men to control the pipe without the device than with it? A. There would be more pressure on the line; it would require more men to hold it and move it around. 57. Q. Did it require more men to hold the hose without the relief operating, in moving it from one story to another in a building, than when it was in operation? A. It did require more men; yes, sir. 58. Q. How many? A. I said it would require four or five men. 59. Q. Have you had occasion during the time prior to 1881 to operate at a fire on the inside of a building when you found it necessary to move from one floor to the other with the relieving mechanism on the engine? A. With the relieving mechanism on the engine at small fires it is under a small pressure, such as we can use with the relief mechanism on an engine. * * * 62. Q. Locked or closed hard upon the seat,—either? A. Yes, sir. 63. Q. With the relieving mechanism locked, how many men did it require, under a pressure of 160 pounds, to remove a line of hose from one floor of a building to another? A. I had the experience of

doing that. Four or five men. * * * 67. Q. Now, operating under like circumstances, with the exception of instead of a locked relief having a relief in operation, how many men would it take to remove the hose from one floor to another, under the circumstances stated in the last question? A. With 160 pounds pressure, about two men."

Many other witnesses, with similar qualifications and experience, covering all this time, have testified how, under varying circumstances, there would be a saving in wear and tear of hose, and the extent of it, and the saving in the number of men necessary to be had with each engine company, and the saving of them. The great majority of all the witnesses in this case on this subject would put the saving of men necessary for each engine company on account of this improvement at three. No one puts it at less than two; and from the kind of savings to which the improvement applies, and the testimony, taken altogether, it is quite conclusive and satisfactory that, at the least, two men could well be dispensed with from each engine company in service during the time and on account of this infringement by the respective engines. The statement of Mr. Purroy, entitled "Supplementary Account No. 2" (Master's Record, vol. 4, p. 5476), shows that from 1865 there were of active engines, besides spares, three; from 1866, three; from 1867, five; from 1868, four; from 1871, five; from 1873, six; from 1874, one; from 1877, three; and from 1880, three,—engines containing the improvement from those times, respectively, to the expiration of the patent, May 24, 1881. Computing the time from when the improvement began to be used in each engine to the expiration of the patent, omitting the two years prior to 1867, the whole number of years for a single engine amounts to 328, which would be, at two men for each engine, equal to 656 years for one man, which, at $3 per day for 308 working days to the year, would amount to $924 per year for one man, and for the two men to each engine to $606,344. While the numbers of men in each company theoretically remained the same, many men were detailed from the companies to do work as plumbers, tinsmiths, caulkers, gas fitters, stone cutters, painters, and many other necessary purposes, which altogether would amount to near as many as have been reckoned at two each to a company in making this computation, and probably to a good many more. This fact that the number was nominally always the same is mentioned by the master, among other things, as a reason for not allowing for the savings as to these men. By the improvement, there was this amount and more or less work of men to be done. That the defendant actually kept so many men in service, when so many less would be sufficient, would make the saving of labor of men none the less. The men were there and used for other purposes, if not idle; and the defendant had so many more men to use for other purposes, in useful labor or in idleness, as should be seen fit. The saving in services of men attributable to the improvement was no less, whether the defendant did or did not actually bring these savings to its own treasury by reduction of the money for this purpose paid out. But, on the whole, it seems clear enough that the defendant did in this way, on account of this improvement, save at least this amount.

An appliance, called a "shut-off nozzle," is referred to as contributing substantially to this saving; but this nozzle, according to the finding and the proof, was a thing long before known, and one of no use whatever, in this connection for this purpose, without this relief valve. It was like any of the other parts of a steam fire engine into which this improvement was put. The saving so made when the engines had these shut-off nozzles, which they could have as well as any other part of an engine, was due wholly to this improvement. It stood in the same relation to that as it did to any other of the parts of the engines, and was entitled to credit for whatever it saved as a part at any time of the then working whole. All the witnesses agree that with that nozzle, but without this improvement, none of this saving could have been made. Besides this, after such showing, if any deduction was to be made on account of the contribution of the shut-off nozzle to the savings, the burden was upon the defendant to show how much it would be. Elizabeth v. Pavement Co., 97 U. S. 126; Crosby Steam-Gage & Valve Co. v. Consolidated Safety-Valve Co., 141 U. S. 441, 12 Sup. Ct. 49; Tuttle v. Claflin, 22 C. C. A. 138, 76 Fed. 227.

The plaintiff claims, and evidence such as has been mentioned tends to show, that engines with this improvement were to those without it, in efficiency, by some witnesses one equal to two, by some two equal to three, and by some three equal to five. The plaintiff claims to recover what it would have cost more to maintain the same efficiency of the fire department with engines of the former style than it has with those having this improvement, as savings due to the improvement. If the defendant had been required by law to provide a fire department up to any certain degree of efficiency, and had made use of this improvement in reducing the number of engines necessary to bring the department up to that degree, there would be reason in saying that the defendant had made as much profit in savings by using the improvement as the engines saved would have cost; but, while the city was required by law to have a fire department, it was not required to have one of any particular efficiency. The extent of it was left largely to the discretion of the officials of that department. They made use of this improvement, but not in any other way than by having it in the defendant's engines. What they saved by it to the defendant was what the cost in the use made of these engines was reduced by it. The other gain was in the improvement of the fire department in efficiency for putting out fires, and not to the city in its expenditures for the fire department. As to this, the conclusion of the master seems to be sound.

The exceptions of the defendant, and those of the plaintiff, as to savings in number of engines, are overruled; those of the plaintiff as to savings in hose and in number of men are sustained; and the savings in hose are found to be $183,394.32, and in number of men to be $606,344, and, including those reported by the master, to be, in all, $818,074.32.