## MacBETH EVANS GLASS CO. v. L. E. SMITH GLASS CO.

District Court, W. D. Pennsylvania. March 8, 1927.

Supplemental Opinion, April 14, 1927.

No. 378.

**1. Patents ⬉318(3)—Accounting period held to begin on date notice of issuance of patent and of infringement was received.**

Accounting period for infringement of patent *held* to begin on date on which notice of issuance of patent and of its infringement was received by person infringing it.

**2. Patents ⬉322—Matters agreed on by parties in patent accounting will be accepted as correct without reference to correctness of method.**

Matters agreed upon by parties in accounting for infringement of patent as exhibited and set forth in statements by their accountants and not controverted either in oral or written argument will be accepted by the court as correct, without reference to correctness of method by which such conclusions were reached.

**3. Patents ⬉322—Master's conclusions on patent infringement suit depending on conflicting testimony have every reasonable presumption in their favor.**

Conclusions of master appointed to state an account of profits derived and damages sustained by reason of patent infringement, which depend on conflicting testimony, have every reasonable presumption in their favor, and will not be set aside or modified unless there clearly appears to have been error or mistake on his part.

**4. Patents ⬉318(2)—Infringer held answerable only for profits actually made from infringing device, with no decree for profits by way of damages.**

Defendant in patent accounting *held* answerable only for profits which he actually made from infringing device, with no decree for profits by way of damages or as punishment for infringement.

**5. Patents ⬉318(3)—Infringing devices sold between date of patent and date of notice of patent and infringement would be excluded in accounting.**

Infringing devices sold between date of patent and date of notice of patent and infringement would be excluded in accounting for profits derived and damages sustained by reason of infringement.

**6. Patents ⬉318(6)—Losses occurring concurrently with gaining of profits will be considered in accounting for patent infringement.**

In determining account of profits derived and damages sustained by reason of patent infringement, losses occurring concurrently with gaining of profits will be taken into account if resulting from particular transaction on which profits are allowed, since, though called losses, they are really diminutions which are taken into account in reaching resultant profits.

**7. Patents ⬉318(6)—Infringer not charged with profits on articles remaining on hand held not entitled to credit for manufacture thereof.**

Patent infringer, who is not charged with any profits on articles remaining on hand, *held* not entitled to claim credit for cost of manufacturing such articles.

**8. Patents ⬉318(6)—Infringer is not entitled, on accounting, to credit for proportionate share of federal income taxes.**

In determining account of profits derived and damages sustained by reason of patent infringement, infringer *held* not entitled to credit for proportionate share of federal income taxes, since Internal Revenue Department alone has power to make adjustment thereof.

**9. Patents ⬉318(6)—Bonus paid by infringer in good faith is part of legitimate cost and expense of business, but if paid as dividends is not part thereof.**

In determining account of profits derived and damages sustained by reason of patent infringement, bonus paid by infringer, if made in good faith as compensation for services, constitutes legitimate cost and expense of business, but, if in fact a distribution of dividends or profits in form of bonus, does not constitute a part of cost.

10. Patents ⊜⟶318(6)—Inventory cost of manufacture of infringing article used as basis for paying federal income taxes held reasonable.

In determining account of profits derived and damages sustained by reason of patent infringement, inventory price or cost of manufacture which had been used as basis in paying large federal income taxes *held* reasonable basis, in view of difference between expert accountants in treatment of items of manufacturing cost.

11. Patents ⊜⟶312(1)—Court is not solicitous to protect patent infringer.

The court is not solicitous to protect defendant engaged in infringing patent.

12. Patents ⊜⟶318(6)—Defendant, in accounting for patent infringement, not charged with infringing articles on hand, is not entitled to credit for cost of manufacture.

Where defendant, in accounting for profits and damages by reason of patent infringement, was not charged with infringing articles on hand, he was not entitled to credit for cost of making such articles, since there were no profits against which such charge was made.

13. Patents ⊜⟶318(5)—Interest is recoverable on sum allowed in patent infringement accounting from date of master's report.

Interest on sum allowed in accounting for profits and damages sustained by reason of patent infringement is recoverable from date of filing of master's report therein.

In Equity. Patent infringement suit by the MacBeth Evans Glass Company against the L. E. Smith Glass Company. On exceptions to the report of the master appointed to take and state an account of profits derived and damages sustained by reason of infringement. Decree for plaintiff.

Reed, Smith, Shaw & McClay and Winter, Brown & Critchlow, all of Pittsburgh, Pa., for plaintiff.

Marshall A. Christy and A. O. Fording, both of Pittsburgh, Pa., Walter S. Wible, of Greensburg, Pa., and William O. Belt, of Chicago, Ill., for defendant.

THOMSON, District Judge. This case comes before the Court on exceptions to the report of the Master, Asa L. Carter, Esq., appointed to take and state an account of the profits derived, and damages sustained, by the plaintiff, by reason of the infringement of letters patent No. 1342744 for modifying the rays of light through automobile lenses.

The defendant began the manufacture of lenses in the summer of 1919, the patent was issued June 8, 1920, and on June 20, of the same year, notice of infringement was given to the defendant by the plaintiff. The master's report exhibits a thoughtful consideration of the questions of fact and legal questions involved. Before the master, expert accountants appeared and testified for both sides, and offered certain exhibits showing in detail the result of their methods and conclusions. On behalf of the plaintiff, Exhibit 2A was offered by Mr. Gardiner, plaintiff's accountant, as an accounting statement prepared by him. In this statement, effect is given to certain changes in fundamental figures, due to a recheck made by plaintiff's accountant, and defendant's accountant, Mr. Kiefer. This statement contains admissions by plaintiff's accountant of the correctness of a number of adjustments made by defendant's accountants, Clark and Anderson; and finally the statement set forth plaintiff's fundamental figures as accepted by the defendant's accountant, in all cases where differences remained between them. The result is shown in said Exhibit 2A. Defendant, however, did not agree that the estimated net profit shown on this exhibit is correct; their contention being that said amount should be reduced in excess of $42,000. A wide difference exists between the claim of the plaintiff and that of the defendant, as well as the conclusion reached by the learned master in his report.

The problems involved are not without difficulty, and I shall be governed in my decision and in the process of reaching that decision, by the following propositions:

[1] First. The master correctly held that the accounting period begins on June 24, 1920, the date upon which the defendant received notice of the issuance of the patent, and of its infringement.

Second. As found by the master, the plaintiff relies solely on the recovery of defendant's profits, making no claim for damages.

[2] Third. The matters agreed upon by the parties as exhibited and set forth in statements by their accountants, and not controverted before the court either in oral or written argument, are accepted by the court as correct, without reference to any view which the court might entertain as to the correctness of the method by which such conclusions were reached.

[3] Fourth. The conclusions of the learned master, which depend upon the weight of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part. Continuous Glass v. Schmertz, 219 F. 199, C. C. A. of the Third Circuit, and other cases there cited.

Fifth. There is nothing which would lead

the court to believe that the defendant did not act in good faith or that it was a wanton infringer. It commenced the manufacture and sale of the lenses about a year before the patent was issued. During this period, it had lawfully made and sold a large quantity of lenses and had built up a large business. When notified of the issuance of the patent, it contested its validity as it had a right to do, and its position was sustained by the trial court which held the patent invalid. Shortly thereafter, and before the cause was heard in the Circuit Court of Appeals, defendant ceased the manufacture of the infringing lenses. The subsequent reversal of the decree under the circumstances carried with it no moral blame.

[4] Sixth. The defendant can legally be held answerable in this accounting only for the profits which it actually made from the infringing device. There can be no decree for profits by way of damages or as a punishment for the infringement except alone to the extent that defendant earned profits in the making and selling of the infringing device. This question must be decided independently of the question of the defendant's general business, whether conducted at a profit or a loss.

[5] Seventh. As held by the master, the infringing lenses sold between the date of the patent, June 8th, and the date of the notice of the patent and infringement, June 24, 1920, amounting to 33,888 pairs, should be excluded in this accounting.

[6] Eighth. While it may be stated as a general rule, that, when a part of the infringement resulted in profits, and a part in losses, the complainant is entitled to recover the profits, without deduction on account of the losses, as each infringement is treated by itself; but losses occurring concurrently with the gaining of profits should be taken into account, if they resulted from the particular transaction on which the profits are allowed. In other words, though called losses, they are really diminutions, which are taken into account in reaching the resultant profits of the sales, on which profits were made.

Ninth. While the defendant was an infringer, it was carrying on a regular and continuous business, during the period of its operations in the manufacture of the infringing lenses. In this continuous business, the infringing lenses cannot be treated separately as constituting a vast number of separate infringements. Hence, in determining the profits, if defendant is charged with the gross sales at the gross selling price, it must be credited with all those items which entered into the cost of manufacture and sale, such as lenses returned, defective lenses, the loss from bad debts and accounts in the sale of the infringing lenses, and also such discounts and allowances as were reasonably incident to the business, so that the defendant may be charged only with the profits actually made.

[7] Tenth. As the defendant is not charged with any profits on the lenses remaining on hand, under all the circumstances of this case, he could not claim credit for the cost of manufacturing the same. As was said in Callaghan v. Myers, 128 U. S. 617, 9 S. Ct. 177, 32 L. Ed. 547:

"There were no profits from copies not sold, and therefore there could have been nothing to charge against said profits."

[8] Eleventh. The defendant is not entitled to credit for a proportionate share of federal income taxes paid by the company in 1920, 1921, and following. I agree with the master that it was his duty to report a definite finding of profits, and that he could not properly recommend a conditional adjustment, as the situation would have required had the credit been allowed. The Internal Revenue Department alone has power to make such adjustment if called for under the circumstances.

[9] Twelfth. Whether all, or a portion, of the bonus paid by the defendant to its officers and employees, should be allowed, must be determined from the facts of the case. The determining question is, Were the payments made in good faith, as compensation for services, and in lieu of increases in salaries, to which such employees were fairly entitled? Or were the payments, though in form a bonus, in fact a distribution of dividends or profits? In the former case, such payments would be a part of the legitimate cost and expense of the business; in the latter case, they would not.

I will now apply the foregoing principles, so far as applicable, to the facts of this case:

It is undisputed that from June 9, 1920, through the years 1921–1923, the end of the accounting period, there were sold in all 665,520 pairs of violet ray lenses. These amounted at the gross selling price to $752,572.47. Thus the gross selling price was $1.15 per pair. But, as found by the master, there were sold from June 8 to June 24, 1920, 33,888 pairs, which, deducted from the gross sales, leaves 621,632 pairs. These, at $1.15 per pair, amounts to $714,876.80.

But defendant did not receive the whole of this money, as appears from the concessions in Plaintiff's Exhibit 2A.

As shown in this exhibit, the defendant sold in 1920, from June 9 to December 31, 240,713 pairs, but it only received for them $280,076.54.

In 1921, it sold 368,664 pairs, but only received $397,342.83, or a total for these two years of $677,419.37.

In 1922, it sent out 32,742 pairs, but had to take back in returns 31,522½ pairs, making its net sales 1,219½ pairs, which were sold at a loss of $7,198.61.

In the same year, as shown in said exhibit, the defendant lost the further sum on bad accounts in the aforesaid sales, the sum of $5,373.09.

In the year 1923, as shown by said exhibit, there were shipped 13,401 pairs, and there were returned 10,742½ pairs. The net sales, therefore, were 2,658½ pairs. These were sold at a loss of $11,707.83.

As further shown on said exhibit, in the year 1923 the defendant lost in bad accounts $3,299.59.

In the year 1924, as shown on said exhibit, the defendant made no sales of violet ray lenses, but took back of returned lenses 2,102½ pairs, and lost thereon $3,627.24. It also lost on bad debts from violet ray lenses $3,944.32.

The business is summarized in the following statement, from which it appears that in the aggregate, from June 8, 1920, to the end of the accounting period, the defendant's net sales of violet ray lenses amounts to 611,-152½ pairs. And its net receipts were $642,-268.69. From this it appears that the actual net selling price was $1.0509 per pair.

The statement follows:

|  | Net Sales. Pairs. | Receipts. |
|---|---|---|
| 1920 (p. 3) | 240,713 | $280,076 54 |
| 1921 (pp. 10, 11) | 117,359 | |
| | 251,305 | 397,342 83 |
| | | $677,419 37 |
| | | Deductions. |
| 1922 (p. 4) | 1,219½ | $ 7,198 61 |
| | | Bad debts 5,373 09 |
| 1923 (p. 5) | 2,658½ | 11,707 83 |
| | | Bad debts 3,299 59 |
| | 613,255 | |
| | Returns. | |
| 1924 (p. 6) | 2,102½ | $ 3,627 24 |
| | | Bad debts 3,944 32 |
| | | $35,150 68 |

Net sales—611,152½ pairs.
Net receipts—$642,268.69.
$1.0509 per pair.

The real problem is to determine the unit cost per pair of the infringing lenses. As heretofore stated, the defendant manufactured a great variety of clear glass articles besides the violet ray lenses, among which were plain or crystal lenses. The defendant made no attempt to classify its factory cost on its different products. All wages paid to workmen and officers went into one account. All money paid for raw material went into another account; money paid for fuel went into a third account, etc. It thus became impossible to determine from defendant's books the cost of making the violet ray lenses, the clear glass lenses, or any one of the variety of its miscellaneous products.

These unclassified factory costs were seven in number, as follows: Glass material; labor; fuel and water; factory expenses; repairs; freight and hauling; depreciation. The costs of defendant's products, other than the infringing lenses, consisted of three classes: (1) Factory cost, comprising the seven unclassified items just mentioned; (2) packing and shipping costs; (3) selling and general expense. To these must be added, in the case of violet ray lenses, a fourth item, viz. painting, or, as called in the record, decorating expenses.

The accountants on both sides were able, from the books, to determine the selling and general expenses applicable to the violet ray business, which amounts to practically $.35 per pair. They were also able to classify and agree upon the packing and shipping costs. The plaintiff's accountant, as appears from Exhibit 3A, made a division of the labor costs of packing and shipping which the defendant has accepted. It there appears that the packing and shipping material cost $.1375 per pair, and the packing and shipping labor cost was $.0883 per pair, making the packing and shipping cost $.2258 per pair. The parties are also in agreement as to the decorating expenses of the violet ray lenses. All of the costs of paint was directly chargeable to these lenses, and the division of painting labor made by plaintiff's accountant was accepted by the defendant. Hence the only items of cost left open to dispute were the seven unclassified items which comprise the prime factory cost.

But, while it is true that the parties reached a common basis on a large number of items which enter into the total manufacturing cost, they wholly fail to agree on the seven items of cost above referred to, designated as unclassified factory costs. This difference is very serious. By the plaintiff's final estimate the total net profit on the violet ray lenses is $84,402.42; to this they add all the bonus paid during the accounting period, amounting to $66,541.63, making a total profit claimed by the plaintiff of $150,-944.05. This is the amount which is claimed, whether computed on the basis of Plaintiff's

Exhibit 2A, plus a bonus, or on the basis of the full amount of the master's award, plus $18,648.98 arising from the alleged improper $.03 item of cost used by the master, and plus also a further amount of bonus sufficient to make a total award of $150,944.05.

On the other hand, from Plaintiff's Exhibit 2A, defendant showed an apparent profit of $34,277.93. From this defendant deducts, after allowing credit for defective lenses and returns in 1920 and 1921, $47,839.-14, thus converting the apparent profit into a loss of $13,561.21. Defendant also seeks to increase the loss by adding the amount of federal income taxes paid during the accounting period, amounting to $29,340.94. This would increase the total loss in the amount of $42,902.15. From this amount, however, defendant deducts the amount of bonus which it concedes was a proper charge against the sales, amounting to $39,838.11. This amount, being deducted, leaves the actual net loss claimed by defendant of $28,075.79.

So far, therefore, from approximating an agreement, the parties actually differ in their method of distributing the seven unclassified factory costs in the sum of $50,-124.49; and, when the question of income tax, unsold lenses, and bonus are considered, the parties are not within hailing distance of each other, the difference between them being $179,019.80. Between these two extremes, with able counsel and expert accountants earnestly differing, there must be a golden mean. It seems to me that the simple and clear method of reaching the profits earned was the general method employed by the master; that is, to determine the selling price per pair of the infringing lenses, and then deducting from that amount the cost of manufacture, the packing and shipping cost, and the selling and general expenses; the balance being the profit or loss per pair.

I think, however, in following this method, the master fell into error by determining the gross selling price, rather than the net selling price per pair of the infringing lenses. This net selling price per pair we have heretofore definitely determined by taking from the gross selling price, which was not in dispute, the conceded deductions for returns, bad debts, bad accounts, etc., as set forth and detailed in our previous statement. The master hesitated to make any deductions for the lenses returned, treating each sale as a closed contract which completely passed the title, and being of opinion that the sales could not with propriety, be opened by the agent (the vendor) without its principal's consent; that is, without the consent of the plaintiff. The master treated the defendant as a trustee for the plaintiff for the profits, and held that defendant should have given the plaintiff some notice of the desire of the customer to open the sale and return the lenses. This, particularly in view of the defendant's position that these returns ruined its profits; the master is of opinion that this profit would have been saved if defendant had turned the sales over to the plaintiff.

It is true that certain cases have declared that the rule for ascertaining the amount with which the defendant is chargeable as an infringer with the payment of profits is that of treating him as though he were a trustee for the patentee as to such profits. But the Supreme Court in Root v. Railway Co., 105 U. S. 189, 26 L. Ed. 975, referring to such rulings, said:

"But it is nowhere said that the patentee's right to an account is based upon the idea that there is a fiduciary relation created between him and the wrongdoer by the fact of infringement, thus conferring jurisdiction upon a court of equity to administer the trust and to compel the trustee to account. That would be a reductio ad absurdum, and, if accepted, would extend the jurisdiction of equity to every case of tort, where the wrongdoer had realized a pecuniary profit from his wrong. All that was meant in the opinions referred to was to declare according to what rule of computation and measurement the compensation of a complainant would be ascertained in a court of equity, which, having acquired jurisdiction upon some equitable grounds to grant relief, would retain the cause for the sake of administering an entire remedy and complete justice."

The court then held that the true rule was that which the court applies in cases of trustees who have committed breaches of trust by an unlawful use of trust property for their own advantage; "that is, to require them to refund the amount of profit which they have actually realized."

I do not see, therefore, that the trust doctrine there applied requires more than the refund of the amount of profits which the defendant actually earned from the use of the infringing device. The defendant therefore, being chargeable only with the moneys which it actually received, and not with the gross selling price, the charging side of the account against it is only $1.0509, rather than $1.15, the gross selling price per pair, which formed the basis of the master's calculations. The item, being the total manufacturing cost, is the largest item of credit in the defendant's favor. This the master, under the evidence,

fixed at $.40 per pair. Involved in this manufacturing cost and out of it arose the wide disparity between the parties in estimating the profit.

As found by the master, the manufacturing cost, as fixed by defendant's inventory, was $.40 per pair; he finds that it has formed the basis of costs for paying large income taxes to the federal government for the past two years without change, and that it has stood steadfastly the unchanged book cost of manufacture in the face of a threatened profit charge on the infringer. The master finds that the defendant's officers and employees appearing before him and testifying had the widest education and experience in the glass-manufacturing business, and all were specialists in the matters of which they took charge and he expressed himself as unable to believe that they did not know to a certainty what every piece of glass they manufactured cost them; that this belief was strengthened because defendant was being charged with heavy income and excess profits taxes, and they knew that the plaintiff was making preparations to take all of the profits it could find on the books for the making of the infringing lenses. He believed himself safe in saying that, when the defendant's officers saw their inventory numbers go down on their trial balance sheet at $.40 per pair, it was a safe estimate of the cost to them, as it was reasonably plain they would be held to strict account for the statement by taxing authorities, and perhaps by the plaintiff. He finds that it must be assumed that the officers, before the passage of the federal income tax laws, were confronted with the overawing force of competition, and were compelled to know the cost of their products with as much certainty as they do now; and that they were much better able to calculate their costs at the times the articles were being manufactured, than expert accountants are able to do now from records of sales alone. [10] I am greatly impressed with the force of this argument and the truth of the master's conclusion. If expert accountants on opposite sides differ to the extent of $50,000 in their treatment of seven items of manufacturing costs, we are driven to look elsewhere for evidence more satisfactory and reliable. I agree with the master that the inventory price of $.40 per pair for the infringing lenses is an admission against defendant's interest, too strongly affirmed to be successfully raised in its favor at this late date, particularly when, over this question, no fixed or accurate result can be definitely determined.

The master considered and stated in his report, that the total manufacturing cost of the lenses was less than $.40 per pair, and included in this charge an indefinite amount allowed for bonus, interest upon investment, and credit for depreciation. The master said, on page 20 of his report: "But, no matter how they may be classified, the master is of the opinion that they have heretofore been considered in the inventory value of cost value of the violet ray or infringing lenses at $.40 per pair." The master further said, in reference to this charge: "This includes all costs any reasonable manufacturer would be deemed to consider in balancing his books for a full manufacturing cost price." Being unable, from the evidence and the briefs of counsel, to reach a conclusion more satisfactory as to the total manufacturing cost, including the items covered thereby as reported by the master, I accept and adopt his finding accordingly.

It would appear that the master made a mistake by inadvertently allowing only $.17 per pair for packing and shipping costs, as it now appears that defendant accepted the figures of plaintiff's accountant in Exhibit 2A, which fixes such cost at $.2258 as hereinbefore set forth. The master allowed an item of $.03 per pair under what he called "miscellaneous expenses." Under the heading of "Miscellaneous Credits" he says: "This constitutes all of the selling price of the infringing lenses disposed of except $.23 per pair." Of this balance the master is convinced that $.03 per pair should be used to cover expenses which have been overlooked, including omitted expenses for overhead in packing and shipping and credits for returns. This position may have been justified as the matter was presented before the master, but, as the cost of packing and shipping had been agreed upon by the parties, and the credits for returns have been duly approved by the court in this opinion, the $.03 item should therefore be eliminated. The importance of this item, although apparently small, will appear when it is remembered that on the net sales it would amount to over $18,000, and on the gross sales, upon which the item was allowed, it would amount to over $10,500.

As showing the profit per pair for lenses, the account stands as follows: The defendant is charged for lenses sold per pair $1.0509. The credits are as follows:

| | |
|---|---|
| All manufacturing cost per pair | $ .40 |
| Packing and shipping cost | .2258 |
| Selling and general expenses | .35 |
| Profit | .0751 |
| | $1.0509 |

Thus the profit on each pair of the net sales is $.0751 per pair; and on the net sales of 611,152½ pairs amounts to the sum of $45,897.55.

## Discussion.

I have, from time to time during the course of this opinion, announced certain positions and the reasons therefor taken by the court. This I will briefly supplement.

Perhaps the most serious question involved is the right of the defendant to recover—that is, to charge against profits—the manufacturing costs of the large number of infringing lenses on hand at the end of the accounting period.

The same general question was presented to the Supreme Court in the case of Crosby Valve Co. v. Safety Valve Co., 141 U. S. 441, 12 S. Ct. 49, 35 L. Ed. 809, which was a proceeding to recover profits for infringement. In that case the defendant reconstructed and modified certain safety valves. The court recognized that this work was in the direction of perfecting the safety valve which they were then producing. The result was that they produced a species of safety valves known as iron safety valves, made and sold after that time by defendants, and which were accounted for by the master and the profits thereon computed. In the labor and efforts of the defendant, certain valves were rendered useless, certain parts of valves, made for them and paid for, were rejected, and the difference between the original cost and their value as old metal became a loss to defendants. The Supreme Court then said:

"All these losses occasioned by the destruction of valves, by the replacing of valves in hands of buyers of valves by giving them new valves for old ones without additional charge, and by the destruction of parts of valves which could not be used because of the modification of the design, were a part of the expense suffered by the defendants in their valve business, in the producing and manufacture of a marketable safety valve, * * * and constituted a wastage in their business which their valve department suffered for the purpose of making more salable products. This loss was an item of expense which should be charged to the cost of valves as such because it became a charge upon all the safety valves thereafter made following the plan and models which resulted from such loss."

This situation then arose: Certain valves had been sold and were returned, and plaintiff claimed that when valves had been accounted for as returned, and the master had deducted the returned valves from the sales and costs, the account then shows itself free from any profits of such valves, and it was claimed by the plaintiff that the cost of these remains a part of the expenses they have incurred in the making of valves which, when destroyed, became a direct loss to them and their business and this loss they sought to recover. The master refused this claim, saying:

"It is clear, upon this statement, that no allowance should be made to defendants for the 69 valves which they made and destroyed without selling or consigning them."

This position was affirmed by the Circuit Court (44 F. 66), in which it said:

"As for the objection to the findings of the master respecting expenses to be allowed for certain valves destroyed, which forms the subject-matter of the first exception, I think the master was right in the conclusion he reached. The defendants were not charged on valves which were subsequently destroyed, or, if so, they were not charged upon the new valves which replaced them. * * * The master properly disallowed the cost of destroyed valves."

As to this ruling, the Supreme Court said:

"Without going into details, it is sufficient to say that we concur in the conclusion that the defendant was not charged for valves which were subsequently destroyed, or, if so, it was not charged upon the new valves which replaced the destroyed valves. As for the contention that the destroyed valves ought to form a credit against the profits actually realized by the defendant on other valves, it is sufficient to say that the only subject of inquiry is the profit made by the defendant on the articles which it sold at a profit, and for which it received payment, and that losses incurred by the defendant through its wrongful invasion of the patent are not chargeable to the plaintiff, nor can their amount be deducted from the compensation which the plaintiff is entitled to receive—citing The Cawood Patent, 94 U. S. 695, 24 L. Ed. 238; Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000; Tilghman v. Croctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664.

[11, 12] The court is not solicitous to protect a defendant engaged in infringing a patent. But courts are just enough to require only from the defendant the profits which he actually made from the manufacture and sale of the infringing articles. It would seem reasonably clear that where the defendant is not charged with infringing articles in the accounting, he is not entitled to credit for the cost of making such article,

as there are not profits against which such charge can be made. The defendant contends that this position is in conflict with the decision of the Circuit Court of Appeals of this circuit, in the case of Continuous Glass Press Co. v. Schmertz Wire Glass Co., 219 F. 199. That case I regard as an absolute controlling authority so far as it was applicable to the facts before it. In that case the court did not allow the cost of manufacture for the product which remained unsold. It is true it was put upon the ground that the product unsold was not satisfactorily accounted for. The court said:

"In order * * * to maintain its right to a credit for the cost of producing the whole, the defendant must show what it did with the whole, and, if converted into money, what it received from its sale. If it shows an amount produced in excess of the amount sold, it must make a satisfactory accounting for the amount unsold; that is, it must make a satisfactory disclosure that it has not been turned into money or other thing from which profits might be calculated."

In other words, as no proper showing was made as to the disposition of the whole product, whether turned into profits or otherwise, the court refused to allow defendant credit for its manufacturing cost. I would be very far from running counter to a decision of the Circuit Court of Appeals of this circuit, and I feel that I am not doing so under the facts as there presented in this case.

Aside from the legal question, there is a question of fact in reference to the lenses on hand, which is adverse to the defendant. The master was of opinion that his refusal to allow the cost of manufacture of the lenses on hand did not run counter to the Schmertz Case; he held that the manufacture in this case is not all proven to be a part of one completed infringing transaction; that the legal infraction arose on the 24th of June, 1920, when the defendant was well under way conducting a perfectly legitimate business; that in December, 1919, it had on hand 6,419 pairs of lenses; that it had a capacity of 2,500 pairs per day, and it was working day and night; and that there is no proof of the number of lenses on hand on June 8, 1920, the date of the patent, except that it was very much in excess of 25,000 pairs. It is clear that whatever amount of violet ray lenses were on hand at the beginning of the accounting period, these could not be taken into account, but would have to be excluded in estimating the profits. This being true, it would be impossible as a matter of fact to determine what number of those on hand at the end of the accounting period were on hand at the beginning of that period, or how many of these were the lenses returned. We would therefore appear to be perfectly justified in the conclusion, not only under the law, but the facts of the case, that the defendant, not being charged with any profits on the lenses on hand, is not entitled to a credit for the manufacturing cost.

The question of credit for federal income taxes has already been considered, and the court has adopted the position of the master, that whatever bonus, interest on investment, or depreciation defendant is fairly entitled to, under all the facts and circumstances, these should be regarded as included in the allowance heretofore made for the total manufacturing costs.

[13] A decree may therefore be drawn awarding to the plaintiff the sum of $45,897.55, with interest from February 18, 1926, the date of filing the master's report. This allowance of interest is in harmony with the case of Crosby Valve Co., supra, and the cases cited at page 457 (12 S. Ct. 55) of that report.

Supplemental Opinion.

After the court had filed its opinion on exceptions to the master's report, the plaintiff filed a motion to correct the opinion in two particulars: One relating to the inclusion by the court in the estimation of profits of the lenses sold between the date of the patent and the date of notice; the other relating to the proper distribution of the bonus. At the final argument on this motion the parties filed a stipulation,[1] which is attached

---

[1] Stipulation.

It is stipulated and agreed between counsel as follows:

(1) The court having inadvertently overlooked the deduction to be made from the defendant's sales of lenses sold between June 8 and June 24, 1920 (stated in plaintiff's opening testimony to have been 33,888 pairs), it is agreed that the correct number, subsequently determined, is 42,126 pairs. The profit of 7.51 cents per pair on these lenses would amount to $3,165.89, thus reducing to $42,731.64 the profit of $45,897.55 found by the court.

(2) It is agreed that the figure of 35 cents per pair, stated by the master and the court as defendant's selling and general expense, includes the entire amount paid by the defendant as bonus.

(3) It is agreed that, if it be the court's opinion that the inventory value of 40 cents per pair, appearing on defendant's books, included all of the share of the bonus which should be considered as a part of cost of manufacture, then the selling and general expense figure of 35 cents per pair should be reduced in the amount of 11.72 cents per pair, and the award accordingly increased in the amount of $66,686.49, making the total award $109,418.13.

hereto and reference to which is made in this supplemental opinion.

As to the matters of complaint: The court had held that the accounting period began on June 24, 1920, rather than at the date of the patent, June 8, 1920, and that the lenses sold within that period should be excluded in estimating the profits. It now appears that these were not in fact excluded in the calculation, and this should therefore be corrected. The amount of the lenses sold within that period is now conceded by the stipulation to be 42,126 pairs, and the profits on these at $.0751 per pair amounts to $3,165.99, thus reducing the profits found by the court of $45,897.55 to $42,731.64.

As to the matter of bonus: By the second paragraph of the stipulation it is agreed that the figure of $.35 per pair, stated by the master and the court as defendant's selling and general expense, includes the entire amount paid by the defendant as bonus, and by the fourth paragraph of the stipulation it is agreed that, if it be the court's opinion that the inventory value of $.40 per pair does not include any share of the bonus, which should be considered as cost of manufacture, and if it be the court's further opinion that the division of bonus made by the defendant is correct, then the award should be increased in the amount of $26,846.38.

In passing on the exceptions, the court had no definite knowledge as to the situation in relation to the bonus, and, in the absence of such knowledge, followed the master's suggestion, which, in substance, was that the indefinite amount applicable to the infringing lenses was included in the $.40 per pair, cost of manufacture. In view of the stipulation in the second paragraph, this was clearly an error.

In view of the fact that the $.40 per pair was carried by the defendant on the books of the company as the manufacturing cost, the court is of opinion, under all the facts and circumstances of the case, that that figure fairly represents the manufacturing cost per pair. I also am of opinion that the division of bonus, as made by defendant's counsel in his calculation, is as nearly correct as is possible to be obtained, and is therefore adopted by the court. In this calculation the account stands as follows:

| | |
|---|---:|
| Foreman and employees | $15,835.35 |
| W. S. Wible | 11,993.20 |
| C. M. Wible | 12,009.56 |
| Total | $39,838.11 |

This sum, being subtracted from the total violet ray bonus of $66,686.49, leaves a balance of $26,848.38, bonus applicable, for which amount the award in favor of the plaintiff should be increased, making the total award $69,580.02, with interest.

A decree will be entered in accordance with the opinion as hereinbefore supplemented.

### Final Decree.

And now, to wit, April 14, 1927, this cause having come on to be heard upon the report of the special master herein, and having been argued by counsel, it is upon consideration thereof ordered, adjudged, and decreed as follows:

(1) That the plaintiff do recover of the defendant the principal sum of $69,580.02, together with interest thereon from February 18, 1926, at the rate of 6 per cent. per annum.

(2) That the plaintiff do recover of the defendant its costs of this suit to be taxed.

(3) That the plaintiff have execution for the sums herein decreed to be paid.

---

(4) It is agreed that, if it be the court's opinion that said inventory value of 40 cents per pair does not include any share of the bonus which should be considered as cost of manufacture, and if it be the court's further opinion that the division of bonus made by defendant is correct, then the award should be increased in the amount of $26,848.58, making the total award $69,580.22.

[Signed]   Winter, Brown & Critchlow,
Counsel for Plaintiff.
[Signed]   Christy & Christy,
Counsel for Defendant.
March 31, 1927.

In entering into the foregoing stipulation, counsel for plaintiff admit the correctness of the awards referred to therein only on the basis of the court's opinion, and they reserve the right on appeal to urge plaintiff's positions as heretofore argued before the master and the court.

[Signed]   Winter, Brown & Critchlow,
Counsel for Plaintiff.